IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 1:18CR-455 (LMB) |
| KEITH R. FOSTER, | ) | |
| | ) | |
| Defendant. | ) | |

**KEITH FOSTER'S
MEMORANDUM IN AID OF SENTENCING**

**1.    Introduction**

On March 8, 2019, Keith R. Foster a 60-year-old male with no prior criminal record, will appear before this Court to be sentenced, on his plea of guilty, to one felony charge. Specifically, on December 19, 2018, Mr. Foster entered a plea of guilty to a criminal information which charged him with selling endangered species illegally imported into the United States in violation of Title 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1)(B). ("The Lacey Act") The maximum penalty for this offense is a term of up to five years of imprisonment, a fine of $250,000, three years of supervised release, forfeiture of assets and a special assessment.

Pursuant to the terms of the criminal information and the subsequent plea, Mr. Foster plead guilty to selling four sawfish blades, a flask and case made from crocodile skin, a jar and a box made from sea turtle shell, a mounted barn owl, a table made with mother of pearl inlay, a turtle shell box, an African antelope mount, a duster made from ostrich feathers and a porcupine quill box. All of these items were decorative items intended to be displayed or used in homes, and were, for the most part, antiques. There were no live animals sold by Mr. Foster's shop, known as The Outpost, which was a design shop featuring local and imported furniture and accents.

The issue for the Court to resolve at sentencing is what sentence is "sufficient, but not greater than necessary" to comply with the purposes of federal sentencing as set forth in 18 U.S.C. § 3553 (a). The answer to that question, it is respectfully submitted, is that a sentence of no active incarceration is appropriate in this case. Mr. Foster, as is described in detail below, is an exceptionally talented and charitable person, with no criminal history, who has accepted full responsibility for his actions. He has already paid a heavy price for his actions including the closing of his entire Outpost business at a substantial loss as well as the severe diminution of the world-renowned golf architecture business he took over thirty years to build. He has suffered public humiliation as well-established golf clubs terminated his architectural contracts literally on the day that the Plea was announced. He has already paid the agreed amount of restitution - $275,000.00 - and has already forfeited all of the items described in his Plea Agreement. As such, there is no legal reason for Mr. Foster to be sentenced to a term of incarceration as the Court can fashion a probationary sentence that will vindicate society's interest in this case and deter others from the type of conduct at issue in this case.

2. **Guidelines**

The Probation Office has calculated Mr. Foster's Guideline's Total Offense Level at 19 with a criminal history category of 1. This calculation was made after recognizing that Mr. Foster had accepted responsibility for his actions and after the United States moved for a one-point reduction arising from Mr. Foster's acceptance of responsibility and assistance to the Government. As such, the guideline range of sentences, subject to the defense's objections below, calls for a sentence of between 30-37 months but not more than 5 years of incarceration. The defense has objected to this calculation.

The guidelines being advisory, the Court, is allowed to render any sentence - up to the maximum jail time or as little as no jail time - that it believes adequately addresses the purposes of federal sentencing law under 18 U.S.C. § 3553(a). Legally, of course, the sentencing guidelines range is only truly advisory. In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court rejected the Government's argument that sentences outside of the advisory guidelines range should be subjected to exacting scrutiny on appeal, because, in part, the guidelines are only one of the factors the consider when imposing a sentence. As the Court explained, the calculation of the guidelines sentencing range is just the "starting point and the initial benchmark" from which sentencing courts should begin to make their sentencing determinations. <u>Gall</u> at 49. That is because, pursuant to <u>United States v. Booker</u>, courts must consider the suggested guidelines as just one of seven co-equal statutory sentencing factors enumerated in 18 U.S.C. § 3553 (a)(1)-(7). <u>United States v. Booker</u>, 543 U.S. 220, 259-60 (2005). Of course, those seven factors are the nature of the offense and the characteristics of the defendant, the kinds of sentences available, the guidelines, any pertinent policy statements, the need to avoid unwarranted sentencing disparities, and any need to provide restitution.

Upon consideration of those factors, this Court should find that this case falls outside of the "heartland" contemplated by the guidelines, because either "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or "the case warrants a different sentence regardless." <u>Rita v. United States</u>, 551 U.S. 338, 351 (2007). While the Court must begin its analysis with a calculation of the advisory guidelines sentencing range, the sentencing court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. This is because the Court, consistent with <u>Rita</u>, is free to disagree, based on the entirety of the §

3

3553 sentencing factors, with the U.S.S.G.'s "rough approximation" of the appropriate sentence in a given case. In the end, the primary directive is to determine under § 3553 (a) what sentence is sufficient in any particular case. While the guidelines provide "categorical" guidance, this Court must consider Mr. Foster as an individual and not assume that the guidelines range is presumptively sufficient. Indeed, given Mr. Foster's history and personal characteristics, a sentence of probation is fair and appropriate.

3. **Objections to Guidelines Calculation**

The principal objection that Mr. Foster makes to the Guidelines calculation is as to the calculation of the "loss" amount as between $250,000 and $500,000.[1] This calculation, it is submitted, while plainly mirroring the agreed restitution amount, overstates the offense conduct in this case. First of all, the Guidelines reliance on the concept of "loss" pursuant to USSG § 2B1.1 is derived, by its own terms from cases involving larceny and embezzlement and other forms of theft. The Guidelines applicable to Lacey Act violations, USSG § 2Q2.1 (b)(3)(A) do refer back to the theft guidelines but it is submitted that such a reference does not fully inform the Court as to the level of conduct at the heart of a Lacey Act case where no funds are stolen or converted. The application of loss guidelines to a Lacey Act case is inexact at best and the facts of this case make that point quite clearly.

In discussions with the Government, counsel have sought to address Mr. Foster's conduct in a manner that is consistent with the actual charges in this case and not just by applying the amount of restitution to the Sentencing Guidelines calculation. Here, many of the items that The

---

[1] The restitution amount, as well as what items in Mr. Foster's store and home would be forfeited, was the subject of negotiations before the Plea Agreement was executed. Many seized items were eventually returned to Mr. Foster as well.

4

Outpost sold and that are listed as illegally sold in the Plea Agreement and Statement of Facts, could have been legally sold and imported into the United States as they did not involve endangered species protected by CITES or the Endangered Species Act. Such items could have been imported legally under procedures that plainly were not followed here and there is no claim that Mr. Foster followed these procedures. Yet the importation and sale of those items did not violate the Lacey Act. Other items such as the sawfish blades, crocodile skins and protected bird trophies, were *per* se illegal to import into the United States under the Lacey Act. Finally, there were also items that Mr. Foster imported into the United States that could have lawfully been imported into the United States and sold, without violating the Lacey Act, if Mr. Foster had obtained a CITES permit and then declared those items to U.S. Customs. There is no claim here that Mr. Foster did have a CITES permit for any of these items.

Again, the defense has conferred with the Government about this complicated issue and have some agreement as to how these three categories of items can be described to the Court. As to items that could have been legally imported into the United States if Mr. Foster had followed applicable procedures, the Government estimates that such sales involved approximately 2/3 of The Outpost's sale of wildlife items. For items that were illegal to sell *per se*, the Government estimates the sales of those items adds up to $96,759.00. For items that could have that could have been imported and sold had Mr. Foster obtained a CITES, the Government estimates that such sales over the almost six-year life of The Outpost totaled another $36,542.50. The total then of sales that would have violated the Lacey Act is $133,301.50. If the Court agrees with the defense and finds the loss amount is $133,301.50, then the enhancement under USSG § 2B1.1 (B)(E) would involve an 8-point enhancement rather than 12 points.

This calculation is important, in addition to the Guidelines issue, because it can focus the Court on the Outpost business as a whole in order to see what part of the overall business centered on the sale of wildlife parts. This is because the Court can determine, as it fashions a sentence in this case, that Mr. Foster's business did not remotely center on the sale of illegally imported wildlife. According to the records of The Outpost, since its inception, the business sold approximately $5,400,000 in items including many household items such as chairs and couches and other design items which were very popular and plainly legal. If the restitution amount of $275,000.00 is selected for reference, then the wildlife sales at The Outpost comprised less than five percent of The Outpost's business. This argument is not made to diminish in any way the seriousness of the offense conduct in this case or Mr. Foster's acceptance of responsibility. Mr. Foster has accepted responsibility for his actions in every way possible. In the end, while fashioning a proper sentence, the Court needs to know how these sales fit into Mr. Foster's business as a whole. What the Court will see below is that Mr. Foster's main purpose in operating The Outpost was to generate income that was later donated to various charities and people he met that were in need of help and not to generate money for Mr. Foster's use..

Finally, Mr. Foster objects to the two-point enhancement applied under USSG § 3B1.1(c). This objection is made because Ms. Rhodes was actually the manager of the store and Mr. Foster, though the owner, was not the leader or supervisor of a criminal organization as that term is used in the Sentencing Guidelines. Mr. Foster has fully accepted responsibility for his role in the offense and continues to do so.

### 4. **Legal Standard for Sentencing**

Pursuant to 18 U.S.C. § 3553(a), the Court is required, in determining the appropriate sentence, to consider the "nature and circumstances of the offense and the history and characteristics of the defendant." In addition, under that same statute, the Court is directed to fashion a sentence that reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense, and the need for restitution. That sentence should also be fashioned with consideration for the need for adequate deterrence to criminal conduct and protection of the public from further crimes by the defendant. 18 U.S.C. §§ 3553 (a)(2)(A), (B), (C) and (D).

Application of these factors to Mr. Foster's case, given his lack of criminal history and his personal characteristics supports the conclusion that no jail time should be given as a sentence in this case. There is no doubt that Mr. Foster recognizes the seriousness of the crime to which he entered a guilty plea and that he has accepted responsibility for his actions. Mr. Foster, if given a sentence of probation, will be able to continue to remain self-employed and keep his business going. There is also no doubt that his public conviction and sentence in this case, as well as the payment of substantial restitution in conjunction with the substantial forfeiture that occurred, will adequately serve the purpose of deterrence to criminal conduct. Finally, this Court can be assured that there is no reason for the Court to act so as to protect the public from further crimes by Mr. Foster who, again, has no prior or subsequent criminal record and will not commit another crime.

### 5. Mr. Foster's. Personal History and Characteristics

From reading the PSR in this case, as well as the many letters from friends, family and business associates that have been given to the Court, the real Keith Foster emerges. He is a good, kind and generous family man. He is a man who is identified by selfless charity which was the original motivation for the creation and operation of The Outpost. He is a man who took no salary from the business of The Outpost and who gave to all of the profits of the store to local charities and, at times, complete strangers who were in great need and whose stories touched him. He is a world- renowned golf architect who learned his craft on his own and ended up working for some of the finest golf clubs in the world only to see his reputation instantly evaporate as a result of his own serious illegal actions. Though he is the man who committed the acts described in the Statement of Facts he is also the man, who in his own words, was taught to accept responsibility for his actions and has done just that by pleading guilty, cooperating with the Government, paying substantial restitution, and agreeing to forfeiture, all as part of the first steps towards earning back his good name.

Mr. Foster wanted to write a letter to the Court in lieu of allocution and that letter is attached as Exhibit 1. In that letter he describes how trying the last year has been to his family and expresses his sincere feelings of remorse. Throughout this entire process, he has never made excuses for his actions and asks that the Court allow him the "opportunity and privilege" to restart his life and rebuild his career. His wife Pam, who was his partner in The Outpost, writes to describe her husband as someone who is well respected because "in addition to his talent, the reason for his success has been his character as a man." She describes how Mr. Foster, well before he entered a Guilty Plea, alerted all of his clients to his pending legal issues only to have most of

them quickly abandoned him.  Through it all, she writes, "Keith has accepted responsibility for his actions and sought out the best way forward."  Mr. Foster is quite fortunate to have such a loving and caring wife.

Mr. Foster's parents and children also wrote letters on his behalf.  In a theme that the Court will see recur, his parents write that they remain proud of their grown son who cried when he told them what he had done and asked for their forgiveness.  They also noted that when his mother was sick, Mr. Foster gave his parents $50,000.00 to cover his mother's medical expenses and gave substantial amounts of money to help his sister who was going through a hard time.  His children Evan and Alexandra love him very much and write how their father has always supported them and given them unconditional love including supporting his adult daughter while she pursued her degree in Special Education.  His son describes his father as a man of great character who he sees as hurt and remorseful.

The stories of Mr. Foster's charity are simply amazing.  His lawyer, Mildred Slater of Upperville, Virginia, writes that she found Mr. Foster to be a kind, generous and honorable person.  She states that as his attorney, she was aware that "Keith did not take any profits from The Outpost, he paid his staff and the net proceeds went to many charities."  This fact is confirmed by Mark Neal who is Mr. Foster's CPA for over 20 years.  He describes Mr. Foster as a "giver and not a taker" who actively "supported local charities everywhere he has lived and his charitable contributions each year far exceed what anyone would consider necessary."  In fact, Mr. Foster, through The Outpost, gave substantial donations to help and protect wildlife such as the Middleburg Humane Foundation and David Sheldrik (an elephant orphanage).  Other donations were made to local charities such as Seven Loaves (a local food bank), Oatlands Plantation and

9

Windy Hill (a local charity involved in creating low income housing).

In fact, all of the net profits of The Outpost and more were donated to charity. In 2014, The Outpost earned a gross profit of $16,000 and donated $27,000 to charity. In 2015, The Outpost earned a gross profit of $17,000 and donated $25,000 to charity. For 2016, with business improving, The Outpost earned $85,000 and made donations equaling $45,000. In 2017, The Outpost earned $46,000 and the Fosters made charitable donations in the amount of $75,000 partially representing the excess profit in 2016. In 2018, the year The Outpost and the Fosters were raided, The Outpost liquidated at a loss to the Fosters of approximately $267,000.00. Despite that loss, and even after paying the restitution in this case, The Outpost made $22,000 in charitable donations and the Fosters made another $100,000 in personal donations that year.

The Fosters never wanted the scope of their charitable donations to become public and would have preferred that these facts remain private. Yet this remarkable level of charity cannot go undisclosed in this proceeding in which Mr. Foster's "characteristics" are a critical factor. The Court has received a letter from Guy Adams, who is the President and CEO of the Christian Appalachian Project. He writes that Mr. Foster and The Outpost made substantial donations to the charity that have helped "thousands of people in need in Rural Appalachia…whose [h]omes have been made warm and dry" and who have received warm coats in the winter because of the Foster's donations. She writes that "Keith and The Outpost have impacted countless lives and provided hope where there was little or none. The impact of his giving is substantial. Keith Foster is one of the most generous individuals I have known." Those sentiments are echoed by Carol Sue Sword who is a former Vice-President of the CAP who writes that Mr. Foster gave the charity an SUV in 2007 and then bought it back at a loss!

The Court has also received an extraordinary letter from a woman named Gretchen Sexton, a woman who, by her own words, hardly knows Keith Foster. She tells a story of how she was on a plane working as a flight attendant in October of 2016 when she was telling a different passenger that her son, who was a young father, had sadly been diagnosed with a Gioblastoma. Apparently, Mr. Foster overheard this conversation and, a month later, Ms. Sexton's son received a note that according to Ms. Sexton said: "I met your mom on a flight a few weeks ago. He said that he owned a furniture store and they usually do well in the month of November and 'by faith' he wanted to give to him what he was hoping would be 10% of the earnings that month. The check was for $8,000." The woman and her son were "stunned" at the generosity of a perfect stranger who made such a gift. Ms. Sexton writes that in January of 2017 Mr. Foster sent an additional $6,000 because, he said, business was better than expected. Ms. Sexton writes that Mr. Foster's donation to her son while "in the last days of his life" was "one of the great blessing of her life" and a "tremendous act of kindness."[2]

The Court has also received many letters from professional acquaintances of Mr. Foster who describe his skill as a golf architect as well as his integrity and generosity. Mr. William Henderson, a former clerk in this Court, writes that Keith is a "gentlemen and a person of integrity." He writes that Keith is "a great asset to the community" who has "suffered greatly, both financially and personally, as a result of the current matter for which he has accepted responsibility. I cannot conceive that he will ever be in such circumstances again." Similar letters come from owners, presidents and superintendents of golf clubs who all vouch for Mr. Foster's unique talents and great integrity. They all refer to his reputation as an architect and hope

---

[2] The Court has also received a letter from the Colliers in England who described Keith's acts of generosity towards a member of the staff at their shop in England.

that this Court will give him the chance to work again and rebuild the reputation that was tarnished by his actions. Other letters come from friends and acquaintances from his work life. All vouch, again for his integrity and the fact that he was been honest about what he did and that he is truly remorseful. In all, these letters give the Court a window into Keith Foster, the man, and all were sent with the hope that the Court would know Mr. Foster as they do and see him as a man deserving of mercy and redemption.

### 6. The Need to Avoid Unwarranted Disparities in Sentencing

It is submitted that a probationary sentence is necessary in order to avoid disparities with similarly situated defendants in other cases involving convictions of the same type of offense. Counsel was unable to find cases substantially similar to this case but did find cases where defendants who were engaged in the actual importation of living endangered species were sentenced to terms of incarceration. There are other cases in which defendants received modest prison sentences where the amount of the sales of wildlife parts far exceeded the amount of sales at issue here. No endangered species were injured, killed or imported in this case and Mr. Foster did not personally profit from any of the sales. Representative cases are set forth below:

United States v. Jacob Chait, No. 1:17-CR-00105 (S.D.N.Y), defendant sentenced to 2 years probation, $3,000 fine and 200 hours of community service for Lacey Act sale and importation of rhinoceros horns and mounts worth an estimated $2,400,000.

United States v. Adam T. Lawrence, No. 4:18-CR-00014 (N.D. Cal.), defendant sentenced to 3 years probation and fined $10,000.00 for illegally killing in Africa and importing a leopard skin and skull into the United States without a proper CITES.

United States v. John Bryan McNamara, No. 1:15-CR-307 (E.D.Va. 2016), this Court sentenced Mr. McNamara to 3 days incarceration, 2 years probation and 50 hours of community service, for illegal import of "cultural heritage" items into the United States.

7. **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, to accomplish Specific and General Deterrence, and to Provide Educational, Vocational or Correctional Treatment**

As is set forth in detail above, a straight probationary sentence is sufficient to promote respect for the law, to provide deterrence and to provide just punishment. Given the substantial restitution and forfeiture in this case, all of which has been accomplished, as well as the fact that Mr. Foster's actions caused great damage to his business and reputation, the principles of general deterrence and respect for the law are well served. The public nature of Mr. Foster's widely reported crime and consequences has already served the purpose of general deterrence. For example, in a blog dedicated to Golf Architecture, a post titled "Architect Keith Foster in Deep Trouble," which posted the DOJ press release about this case, had over 12,000-page views and 140 posts, many linking to other stories about the case. There were many newspaper articles as well and attached hereto is a mere sampling of the press this case has attracted including many that detail how Mr. Foster lost large contracts at substantial golf clubs and was otherwise subject to public humiliation and scorn. For Mr. Foster, who has closed his Outpost business, there is no likelihood of a recidivism.

There is no need for any educational, vocational or correctional treatment.

**8. Conclusion**

In closing, the most compelling reason for the Court to not impose a sentence of active incarceration is the personal integrity of Mr. Foster. There is no doubt that Mr. Foster made a

13

series of mistakes that took place over a long period of time for which he must be fairly sentenced. He has acknowledged that what he did was wrong and has done everything possible to accept responsibility. Mr. Foster has never before violated the law and there is little doubt that he will not do so again. What Mr. Foster respectfully requests is that the Court show mercy on him and allow him to stay at home, keep his job and begin to rebuild the life and reputation that he alone is responsible for damaging.

Dated:   March 1, 2019

**KEITH R. FOSTER**
By Counsel

By:  _____/s/_____
Edward B. MacMahon, Jr.
VSB No.   25432
Edward B. MacMahon, Jr., PLC
P.O.   Box 25
107 East Washington Street
Middleburg, VA      20118
(540) 687-3902
(540) 687-6366
ebmjr@macmahon-law.com
*Counsel for Defendant Keith R. Foster*

CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:  _____/s/_____
Edward B. MacMahon, Jr.
Edward B. MacMahon, Jr., PLC
107 East Washington Street
P.O. Box 25
Middleburg, VA 20118
(540) 687-3902
(540) 687-6366 (facsimile)
ebmjr@macmahon-law.com
*Counsel for Defendant Keith A. Foster*