IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 1:18cr 455 |
| | ) | |
| KEITH R. FOSTER | ) | |

POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING FACTORS

In accordance with Section 6A1.2 of the *Sentencing Guidelines* and this Court's policy regarding guideline sentencing, the government hereby represents that it has reviewed the Probation Office's presentence report and that it does not dispute any of the factors or facts set out therein. The defendant's sentencing guidelines range is accurately calculated at 30-37 months in prison. The conduct of conviction, however, does not squarely fall within the heartland of the conduct measured by the applicable guidelines.

Facts

Over a five-year period ending in 2018, the defendant imported at least 35 separate shipments of merchandise for resale at his business (known as The Outpost), some of which contained wildlife and wildlife parts, but he failed to declare any of the wildlife within those shipments to the U.S. Fish and Wildlife Service upon import, as required by law. To conceal the existence of wildlife pieces in the shipments and evade detection by the U.S. Fish and Wildlife Service, he caused many pieces to be labeled in a manner that obscured their true nature.

The defendant then sold at his store the wildlife pieces that he illegally imported. During the five-year period in question, he sold nearly $400,000 worth of items that constituted or

contained parts of endangered species and other wildlife that he illegally imported into the United States. These items included Endangered Species Act items such as sawfish blades, crocodile skin bags, wallets and flasks, and handicrafts made of sea turtle shell.

In a telephone call with a customer on January 6, 2017, the defendant admitted that he should not be importing sawfish blades. "In truth I shouldn't be bringing those in. . . . Fish and Wildlife, if they opened up that, and found it . . . they would confiscate my whole container." He said "rest assured. I'm gonna bring more in. Cause I'm the only fool in the States that probably wants to risk it." In short, the defendant knew what he was doing was wrong, but did it anyway.[1]

## Argument

The nature and circumstances of the defendant's offense, as well as the value of general deterrence, warrant a significant penalty in this case. That being said, the results of the calculation of the Sentencing Guidelines is not particularly helpful in this case.

This is so because the sentencing range at Section 2Q2.1 is determined on the basis of the value of the wildlife products that were illegally imported, but the Guidelines' calculation of value is apparently based on the assumption that all of the wildlife products were necessarily illegal to collect or import in the first place. In this case, however, many of the wildlife products sold by the defendant were legal for collection or import, *so long as* Foster obtained the proper permits, labeled them properly, and made them available for inspection by the Fish and Wildlife Service. Accordingly, this case is *not* akin to that of an importer of $400,000 worth of elephant ivory or

---

[1] The defendant's argument that he should not be held responsible for directing the actions of his employee at The Outpost should be rejected. She gained nothing from the defendant's criminal activity, and participated in it because her job depended on it.

2

rhino horn. Yet, by the guidelines, the defendant's guideline range is calculated in the same manner as if his imports were not mostly legal products, but instead all illegal ivory or rhino horn.

The 2Q2.1(b)(3)(A)(ii) enhancement treats the value of the import of sawfish blades and parts of endangered species and species protected by the Convention on International Trade in Endangered Species ("CITES") - - wildlife parts that never lawfully could be imported for commercial purposes - -  the same as it treats the value of the import of "unprotected" wildlife parts, such as porcupine quills, African game mounts, ostrich pieces, deer antler, horn, and bone that, under certain procedures (not followed by the defendant), lawfully could be imported. All other things being equal, a defendant who unlawfully imported wildlife material that could never lawfully be imported should be punished more severely than a defendant who unlawfully imported wildlife material that could have been imported lawfully, had he only declared them properly, obtained the proper licenses, and followed the appropriate regulations.

By our calculations, the total value of the import of CITES protected wildlife, endangered species and protected birds that the defendant always knew that he could not lawfully import under any circumstances, but did so anyway  - - such as tortoiseshell, sea turtle, sawfish blades, crocodile, owls, hawks, and ivory - - was approximately $100,000.

Approximately another $35,000 worth of imports consisted of items that were protected by CITES, and that the defendant reasonably should have known could not lawfully be imported - - such as coral, swans, songbirds, other migratory birds, rosewood, hippopotamus, and

tortoiseshell pieces that were not explicitly labeled as such - but nevertheless were clearly tortoiseshell.[2]

The remaining items consisted of "unprotected" wildlife and wildlife parts, such as porcupine quills, African game mounts, ostrich pieces, deer antler, horn, and bone, that was not protected by CITES, the Endangered Species Act, or any other notable wildlife law. Had the defendant taken the proper regulatory steps, he probably could have imported these items lawfully. Those steps would have included obtaining an import license from the U.S. Fish and Wildlife Service; importing all wildlife and wildlife parts at a port designated for that purpose by the U.S. Fish and Wildlife Service (to enable a Fish and Wildlife Service inspector to examine them before they were allowed into the country); and accurately declaring all wildlife and wildlife parts upon its import into the United States.

Taking the proper regulatory steps, as specified above, would have increased the defendant's costs in time and money. Yet, his actions do not appear to have been motivated by an attempt to save time or money. To the contrary, his actions appear to have been motivated by a desire to seek the thrill of doing things that were forbidden.

The defendant likely did not take the proper regulatory steps to declare unprotected wildlife because of the added cost or inconvenience, but because it would have created a reason for the Fish and Wildlife Service to look at all of the items that he was importing. Because he was regularly importing items that were illegal to import under any circumstances, he sought to avoid all regulatory scrutiny, and chose to operate completely outside the lawful regulatory

---

[2] This amount does not count ivory pieces that the defendant told the investigators that he thought was not ivory, but bone.

framework. Indeed, we do not think that the defendant's actions in this case were motivated by money at all.

The defendant has paid a significant financial penalty in connection with this prosecution already. On December 19, 2018, this Court ordered the forfeiture of scores of individual pieces of wildlife and wildlife parts owned by the defendant, and the imposition of a money judgment of $275,000. That money judgment has been paid and satisfied. In Paragraph 7 of the plea agreement in this case, the United States agreed that it would not ask the Court to impose as part of the sentence in this case any financial penalty other than the forfeiture and the money judgment, except the mandatory special assessment of $100. Accordingly, the only financial penalty that we now seek is imposition of the mandatory special assessment of $100.

A defendant who on a single occasion violated any one of the import regulations described above ordinarily is liable for a citation issued by a Fish and Wildlife Service officer. The following is the penalty schedule used by the Fish and Wildlife service:

| Violation | Penalty First Violation | Penalty Second Violation | Penalty Third Violation |
|---|---|---|---|
| Import/Export | $500 - $4,000 | $2,000 - $15,000 | $7,500 - Statutory Maximum |
| Possess, deliver, carry, transport, sell or ship illegally taken threatened or endangered species in interstate or foreign commerce | $3,500 - Statutory Maximum | $7,500 - Statutory Maximum | $13,000 - Statutory Maximum |
| Deliver, receive, carry, transport, sell or ship threatened or endangered species in interstate or foreign commerce | $500 - $3,000 | $1,500 - $10,500 | $5,500 - Statutory Maximum |
| Trade in violation of CITES | $500 - $2,500 | $1,500 - $10,500 | $5,500 - Statutory Maximum |

*See* http://www.gc.noaa.gov/documents/gces/6-ESA/esa_1208.pdf (accessed March 1, 2019).

As the Court can see, the financial penalties for even a single violation of the applicable regulations can be significant. According to the schedule, the penalties are even more severe for the second and third offenses. But what is the appropriate punishment in a case like this, with scores of knowing violations over a period of years - - and where the defendant has substantial assets and a high income? Whatever that appropriate punishment may be, a financial penalty alone obviously is insufficient to address all of the conduct properly.

As noted above, the defendant should not be punished as if he imported $400,000 worth of elephant ivory or rhino horn. To his credit, he entered his guilty plea pre-indictment, and accepted responsibility for his offense. Moreover, he paid the $275,000 money judgment the day that he entered his guilty plea. Further, he consented to the forfeiture of scores of wildlife items owned by his business. Finally, we understand that, as a consequence of the spread of news regarding his offense, the defendant has suffered significant collateral consequences to his golf course design business.

Yet, the defendant's offense conduct was serious. It was not the result of a single bad decision in a moment of weakness, but encompassed hundreds of discrete decisions to violate the law over a five-year period. It was not the result of a need to feed his family, but of hubris and thrill-seeking. We expect that, as a result of the serious consequences that the defendant has already incurred, he is unlikely to repeat his criminal conduct. That being said, society's interest in general deterrence still requires a punishment that will signal to others who might be considering engaging in similar conduct that doing so will trigger serious consequences under the law.

Conclusion

For the foregoing reasons, a term of confinement is necessary to reflect the seriousness of the defendant's offense, promote respect for the law, provide just punishment for his offense, and afford adequate deterrence to criminal conduct.  Further, as a condition of supervised release, a significant requirement of time devoted to community service is appropriate.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:  _____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

/s
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov